NATIONAL LABOR RELATIONS BOARD v. MORRIS P. KIRK & SON, Inc., et al.

No. 10534.

Circuit Court of Appeals, Ninth Circuit

Aug. 30, 1945.

Rehearing Denied Dec. 28, 1945.

Alvin J. Rockwell, Gen. Counsel, NLRB, and Malcolm F. Halliday, Associate Gen. Counsel, Frank Donner, Eugene J. Davidson, and Joseph Robison, Attys., NLRB., all of Washington, D. C., for petitioner.

Latham & Watkins and Richard W. Lund, all of Los Angeles, Cal., for respondent Morris P. Kirk & Son., Inc.

Before DENMAN, STEPHENS, and BONE, Circuit Judges.

DENMAN, Circuit Judge.

In this case the National Labor Relations Board seeks enforcement, pursuant to Section 10 of the National Labor Relations Act, 29 U.S.C.A. § 160, of its order issued against respondents.

Respondent Morris P. Kirk & Son, Inc., hereinafter called Kirk, is a Nevada corporation engaged in the manufacture and sale of lead allied products. It has its principal place of business in Los Angeles. The Board found this respondent guilty of violation of Sections 8(1), 8(2), 8(3) and 8(5) of the Act, 29 U.S.C.A. § 158(1, 2, 3, 5).[1]

With respect to Section 8(2), the Board found that Kirk had contributed support to, dominated, and interfered with the formation and administration of the Morris P. Kirk & Son, Inc., Employees Association, a union of its employees, hereinafter called Association. It found, too, that, acting together with the other respondents, Kirk contributed financial and other support to, and dominated and interfered with the formation of and administration of the Liberty Protective League, a later organized employees' organization, hereinafter called League.

As to Section 8(5), the Board found that Kirk refused on February 6, 1939, and at all times subsequent thereto, to bargain collectively with Local 468 of the International Union of Mine, Mill and Smelter Workers, affiliated with the C.I.O., and hereinafter called the Union. It found that the Union was the exclusive representative of Kirk's employees and was an appropriate bargaining unit.

In regard to Section 8(3) of the Act, the Board found that on April 10, 1939, Kirk discriminated against one of its employees a George Hammond, in discharging him because of his activities in behalf of the Union. Discharges of certain other employees were found to be non-discriminatory within the Act and are not involved in this proceeding.

The Board found also that by virtue of the course of conduct above outlined, as well as by anti-union activity of certain of its supervisory employees, respondent Kirk had violated Section 8(1) of the Act.

Kirk and the Board stipulated the facts showing Kirk was engaged in transactions in interstate commerce conferring jurisdiction on the Board.

The other respondents are Southern Californians, Inc., The Neutral Thousands, Inc., and Employees Advisory Service, a partnership consisting of Glancy L. Huff

---

[1] "Sec. 8. It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7.

"(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: * * *

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *

"(5) To refuse to bargain collectively with representatives of his employees, subject to the provisions of section 9(a)."

Section 7, 29 U.S.C.A. § 157, provides:

"Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

Section 9(a), 29 U.S.C.A. § 159(a), provides:

"Sec. 9(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer."

and Clay C. Rittenhouse. The subversive character of these respondents in their continuous and successful activities in the formation of company dominated unions, in violation of the National Labor Relations Act, is fully set forth in our opinion in National Labor Relations Board v. Sun Tent-Luebbert Co. et al., 9 Cir., 151 F.2d 483, this day decided, the evidence in which respecting such activities is stipulated to be a part of the evidence of the instant proceeding. Because of their participancy in the violations of the Act, hereinafter considered, we order the enforcement of the Board's order as to them.

■ Respecting the Board's order disestablishing the Association and the League, there is abundant evidence that both were organized and dominated by Kirk through its supervisory employees, in violation of Section 8(2) of the Act. Rittenhouse, the agent of Southern Californians, Inc., and The Neutral Thousands, Inc., aided in the organization and dominance of the latter union.

■ There is also evidence to support the Board's finding that Kirk refused to bargain with International Union of Mine, Mill and Smelter Workers, Local No. 468. The Union, made up of 59 nonsupervisory employees, was found by the Board to be their bargaining agent. It remained such bargaining agent even after resignations procured by Kirk's activities in the formation of the League had reduced its membership to less than a majority. National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 340, 60 S.Ct. 918, 84 L.Ed. 1226. The evidence supports the following statement of facts in the Board's brief respecting Kirk's refusal to bargain.

■ On or about February 6, 1939, a committee of four union employees and Roy Livingston, a representative of the International Union, met at the plant with respondent's officials and sought recognition and bargaining rights. President Kirk first challenged the jurisdiction of the Union and then reviewed his past relations with the employees citing instances of his generosity and expressing surprise that they "would join the union" since he felt "that they were a large happy family." He urged them to bargain individually and to "forget all the outside organizations." Kirk referred to Hammond (subsequently discriminatorily discharged) and William Austin, members of the committee, as "labor agita-

tors" who were unaware of "how the Company worked with their men" and as "the ones that are most discontented." Austin was, moreover, castigated as ungrateful because he "promised to forget all about unions when he came to work in the plant." He was also charged with "coming in here and starting trouble."

When the committee proposed that the Company submit its pay-roll list and the Union submit its designations as bargaining agent to the Board for a card check, Kirk rejected this suggestion. He insisted that the sole method acceptable to him of proving the Union's majority status "would be to have a ballot box on his desk and have every worker come in and sign what union they wanted to belong to or by coming to him personally and talking to him." Any doubt as to the meaning of the demand is entirely dispelled by the fact that when Livingston thereafter asked Kirk if he would deal with the committee of the Union regarding grievances and other matters, without granting exclusive recognition, Kirk replied that he would not meet with the committee under any circumstances.

Little more than a month after Kirk rejected the Union's proposal for a Board-supervised card check, it granted its own organization, the League, recognition based upon a card check conducted in its office. This fact alone demonstrates that respondent's refusal to accept the Union's claim to majority merely cloaked a determination not to yield it bargaining rights under any circumstances. By President Kirk's insistence on a company conducted election, by his statements in derogation of the Union and the committee members, by his refusal to meet again with the committee, respondent Kirk demonstrated its "rejection of the collective bargaining principle." Moreover, when these facts are considered in the light of the formation, through the concerted conduct of all the respondents, of the League, which was designed to eliminate bargaining altogether, it is plain that respondent at no time intended to bargain with the Union.

■ There is also evidence to support the Board's finding that George Hammond, a trustee for the Union, was discharged because of his union activities. He had refused to join the company dominated unions and was a vigorous organizer of and trustee for Union. He was discharged on the claimed ground that he put too much coke in the furnaces. The Board chose to

believe the evidence to the contrary of Kirk's superintendent Dubs, as follows:

"* * * he was not discharged for putting too much coke on the furnace; that was entirely immaterial; that in spite of repeated warnings and also talks there, he had failed to take the thing the way the rest of the boys were doing, and had made himself so obnoxious on the job that I just didn't feel like having him in our employ any longer."

When William Austin, also present, asked why the trouble had developed since the union was formed, Dubs, according to the testimony credited by the Board, replied:

"* * * alright. You asked for it, here it is. Prior to the time that there was any activity whatsoever I considered you and George [Hammond] and the rest of the operators and helpers on the blast furnace the best crews that we had ever been able to obtain on the furnace. We had our trouble which didn't amount to very much but we got along fine. And thereafter the C.I.O. activities had started up, openly into the plant, things started to go bad right away. Now that's the only answer I can give you."

We order the enforcement of the Board's order, save as to paragraph 1(a) (5) and save as to the last fourteen words of 2(a) (2). An appropriate decree shall be entered.

STEPHENS, Circuit Judge (concurring).

I concur in the opinion with the proviso that reference therein to the opinion in National Labor Relations Board v. Sun Tent-Luebbert Co., 1945, 151 F.2d 483, shall be modified, so far as my concurrence goes, by my dissent in that case. I concur in the proposed order of this court.